IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 08-00124-01-CR-W-NKL<br>Case No. 08-00162-01-CR-W-NKL |
| MATTHEW HARKER, | ) ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on the issue of whether medication should be involuntarily administered to defendant Matthew Harker in an attempt to restore competency. For the reasons set forth below, it is recommended that defendant Harker be forcibly medicated.

I. INTRODUCTION

On May 1, 2008, defendant Harker was charged in a Criminal Complaint with threatening to murder Judge Dean Whipple and Judge Ortrie Smith, United States District Judges for the Western District of Missouri. The affidavit in support of the complaint indicated that on May 1, 2008, a message was left on the voicemail for Judge Whipple's chambers by a person identifying himself as Matthew Harker. The affidavit set forth the following:

> 2. ... Matthew Harker has a documented history with the United States Marshals Service of making threats against the federal judiciary dating back to 2005. The caller talked of various violations against the Constitution that have been committed by United States District Judge Dean Whipple and United States District Judge Ortrie Smith. The caller concluded the call by stating the following, "If I see Mr. Whipple or Mr. Smith, I will kill Mr. Whipple or Mr. Smith. They will correct themselves, they will carry through on the case or they will not live."
>
> 3. Matthew Harker had three cases dismissed in the United States District Court for the Western District of Missouri: *Harker v. United States Government*, No. 03-CV-00634-ODS; *Harker v. United States Government*, No. 03-fp-00518-DW; and *Harker v. Blakey*, 05-fp-06038-ODS.
>
> 4. The caller ID of the voicemail showed the telephone call was received from (816) 858-7118. That telephone number is serviced by Exop of Missouri, Inc. Exop of Missouri, Inc. advised the current subscriber of (816) 858-7118 is Matthew Harker, 918 Fontana, Apartment 7, Platte City, Missouri.

> 5. Matthew Harker was arrested on this date as he exited his apartment building. Harker made the following unsolicited post-arrest statement: "I have asked for someone to come talk to me, I have asked to talk to someone at the courthouse, I make one phone call and you think that gives you the right to arrest me."

(doc #1-1 at 1 in Case No. 08-00162)

On May 8, 2008, the Grand Jury returned a two-count indictment against defendant Harker in Case No. 08-00124-01-CR-W-NKL. Count One of this indictment charged that on February 4, 2008, defendant sent an e-mail to a Federal Aviation Administration ("FAA") representative threatening to injure the person of another with the intent to extort from representatives of the FAA Airman Medical Certificates previously held by defendant. Count Two charged that on December 1, 2004, defendant made material false statements in an Application for Airman Medical Certificate in that he certified that his FAA Airman Medical Certificate had never been suspended, knowing that his FAA Airman Medical Certificate was suspended on January 7, 2002.

On May 8, 2008, the Government filed a Motion for Psychiatric Examination. Defendant Harker was examined at the Medical Center for Federal Prisoners in Lexington, Kentucky, by Dr. Karen Milliner, a forensic psychologist. Dr. Milliner found defendant not competent at the present time, but found that there was a substantial probability that he could attain competency in the foreseeable future if he were committed for treatment.

On June 24, 2008, a one-count indictment was filed against defendant Harker in Case No. 08-00162-01-CR-W-NKL, alleging a threat against a United States judge. This was the charge previously brought by complaint on May 1, 2008.

A competency hearing was held on August 6, 2008, before Magistrate Judge Robert E. Larsen. Magistrate Judge Larsen issued a Report and Recommendation recommending that the District Court enter an order finding defendant Harker incompetent to stand trial and further recommending that Harker be committed to the custody of the Attorney General for hospitalization and treatment pursuant to 18 U.S.C. § 4241(d). On October 7, 2008, District Judge Nanette Laughrey issued an Order finding defendant Harker incompetent to stand trial and committed him

2

to the custody of the Attorney General to determine whether there is a substantial probability that in the foreseeable future Harker will attain the capacity to permit the trial to proceed.

Defendant Harker arrived at the Federal Medical Center in Butner, North Carolina on November 13, 2008. By letter of March 20, 2009, Judge Laughrey was advised by the Medical Center that defendant Harker required treatment with psychotropic medications in order to restore his competency to proceed to trial, but that defendant Harker refused to voluntarily accept such medication as a form of treatment.

On April 23, 2009, the undersigned held a telephone conference with counsel to discuss scheduling a Sell hearing (a hearing to determine whether psychiatric medications should be involuntarily administered to the defendant). Defense counsel requested and was given the opportunity to obtain the services of Dr. Steven Peterson, a forensic psychiatrist, to review the report from the Medical Center and to examine defendant Harker regarding treatment prior to a hearing. Pursuant to defendant's motion, the Federal Medical Center in Butner was directed to provide the Court with defendant's complete medical chart and psychiatric file. These medical records were provided to the parties on July 7, 2009.

On July 29, 2009, the undersigned held a telephone conference with counsel to again discuss scheduling a Sell hearing. Defense counsel requested that the Court obtain defendant's medical records from his examination at the Medical Center for Federal Prisoners in Lexington, Kentucky. The Court directed the Medical Center to provide said records. The government was directed to make the necessary arrangements to have defendant returned to this district for a Sell hearing.

On November 10, 2009, an evidentiary hearing was held to determine whether psychiatric medications should be involuntarily administered to the defendant in an attempt to restore his competency to proceed to trial. Defendant Harker was represented by Bruce C. Houdek and Thomas A. Houdek. The Government was represented by Assistant United States Attorney William L. Meiners. The Government called Dr. Bruce R. Berger, a staff psychiatrist at the Federal Medical Center in Butner, North Carolina, as a witness.

3

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. Dr. Bruce R. Berger has previously testified in approximately thirty <u>Sell</u> hearings and the parties stipulated that Dr. Berger is an expert in this area. (Tr. at 4)

2. Defendant Harker was evaluated at the Federal Medical Center in Butner, North Carolina, by Dr. Kelly Adams, a forensic psychiatry fellow. (Tr. at 5) Dr. Berger was the direct supervisor of Dr. Adams and specifically advised her on defendant Harker's case. (Tr. at 5) Dr. Berger also supervised Dr. Adams' preparation of the Forensic Evaluation report for defendant Harker. (Tr. at 5) Dr. Berger agrees with Dr. Adams' findings which are set forth in this report. (Tr. at 5) As Dr. Adams successfully completed her fellowship at the Federal Medical Center in June 2009, she was not available to testify, so Dr. Berger testified at the hearing in place of Dr. Adams. (Tr. at 5) Dr. Berger testified that typically, Dr. Adams would meet with the defendants she was evaluating on a weekly basis, if not more frequently. (Tr. at 12)

3. The Forensic Evaluation report, prepared by Dr. Adams and signed and supervised by Dr. Berger, was admitted as Government's Exhibit 1. (Tr. at 5, 10) The report states that defendant Harker was admitted to the Mental Health Department of the Federal Medical Center in Butner, North Carolina on November 13, 2008. (Government's Ex. 1 at 1) The report was dated March 9, 2009, and signed on March 23, 2009. (<u>Id.</u>)

4. Under the heading <u>Course in Institution</u>, the Forensic Evaluation report provides in part:

   * * *

   > On the admission mental status examination, ... [Mr. Harker's] thought content was positive for delusional context and possible auditory and visual hallucinations. His insight and judgment were poor.
   >
   > Mr. Harker was initially admitted to a restricted unit, 1-E, secondary to his refusal to sign intake paperwork. He was transferred to the open mental health unit the following day. Nursing and Correctional Staff noted Mr. Harker was cooperative, though paranoid and isolative. He participated with the Vocational Rehabilitation Workshop regularly. He was referred to and attended Competency Restoration curriculum. He was asked to leave group meetings on more than one occasion, when he could not be redirected from discussing his delusional beliefs about the U.S. Government and court procedures during sessions. During interviews, Mr. Harker became irritated when the delusional content of his beliefs was confronted, requiring interviews to end abruptly. He repeatedly required redirection when his responses became tangential (irrelevant) and perseverative (repetition of specific concepts).
   >
   > ... He reported he did not currently have a defense attorney, stating "I'm Pro

4

Se." Mr. Harker explained the Supreme Court authorized him to proceed pro se after he was admitted to FMC Butner.

* * *

... Mr. Harker reported there was not any evidence in his case; when asked about the voicemail recording, be became guarded and stated he did not want to discuss it. ...

* * *

... Mr. Harker opined he would not receive a fair trial, as he believes there is a conspiracy against him. He described his belief that federal judges are trying to retaliate against him for bringing lawsuits against the U.S. Government. He stated the Judges involved in his case are in contempt of court and he is working with the Supreme Court to have them disbarred.

Mr. Harker was unable to discuss his role in the legal proceedings against him without expressing his delusional beliefs. He reported he was facing charges for threatening the FAA and a Judge, and was also accused of fraud. He reported the fraud charge is related to claiming something is a lie. He then reported the Federal Judge is facing these same charges, and will be removed from the bench. Mr. Harker reported "I've already beat the rap, I've beat these charges." Attempts to explain admission to FMC Butner and evaluation process were not well received. Mr. Harker told the evaluator, "You just threw out the Constitution. You're a vigilante." After being redirected and he was able to regain composure. Mr. Harker reported he was not concerned with the results from this evaluation. He stated, "I will be out of here in 30 days, I'm going to get my pilot's license, and a settlement from the FAA." He reported that if found guilty of the current charges, He could face up to a $750,000 fine or 5-20 years imprisonment. However he was adamant he could not be found guilty because his constitutional rights have been violated.

(Government's Ex. 1 at 5-7)

5. Under the heading <u>Psychological Testing</u>, the Forensic Evaluation report provides in part:

Collateral information revealed Mr. Harker was recently administered two intelligence measures, two personality measures, and a competency assessment instrument. In her evaluation Dr. Milliner wrote, psychological testing "suggested a mentally disturbed individual whose thinking, reasoning, and reality testing surrounding his legal situation are impaired." Dr. Milliner also noted cognitive and intellectual testing described him as being in the "high average to superior range of functioning." Personality assessment conducted by Dr. Milliner described Mr. Harker as an individual who minimized personal problems and made an effort to avoid appearing mentally ill. Results of the competency measure indicated Mr. Harker displayed a factual understanding of the proceedings. Mental illness, however, was noted to have affected his rational ability to participate in his legal case and assist an attorney in defending him.

5

> Since Mr. Harker's arrival at FMC Butner, there has been no change in his overall mental status and previous testing by Dr. Milliner provided an accurate description of his current psychological functioning. During the current evaluation, Mr. Harker was asked competency-related questions. However, no additional psychological testing was conducted.

(Government's Ex. 1 at 7-8)

6. Under the heading Impressions, the Forensic Evaluation report provides in part:

> Mr. Harker's principal diagnosis is Psychotic Disorder Not Otherwise Specified. The DSM-IV-TR designates this category to describe psychotic symptomatology, in this case delusions, about which there is inadequate or contradictory information preventing the diagnosis of a specific diagnosis. Mr. Harker has persistent, non-bizarre (i.e. involving situations that occur in real life) persecutory and grandiose delusions. He believes the U.S. government and specific federal judges have conspired to "trump up" charges against him. He believes he is working with the Supreme Court to have these federal judges disbarred. He also believes following his release form FMC Butner, his pilot's license will be restored and he will also receive a large settlement from the FAA. These delusions have caused impairment significant enough to meet criteria for Delusional Disorder. However, according to collateral information, Mr. Harker has also experienced hallucinations. Though he has displayed paranoid behavior, we have not observed Mr. Harker responding to internal stimuli during this evaluation period. If this combination of symptoms was present for a one-month time period, Mr. Harker would meet the diagnostic criteria for the Paranoid Type of Schizophrenia. Without this information, Mr. Harker is diagnosed with Psychotic Disorder Not Otherwise Specified.
>
> In response to the Court's question of whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the trial to proceed; we opine that Mr. Harker, due to a mental defect, does not understand the nature and object of the proceedings against him and is not able to assist properly in his defense. While it is clear Mr. Harker has an adequate understanding of basic legal concepts; his thought disorder prevents him from understanding his role in the legal proceedings against him and being able to assist counsel in his defense. Due to the pervasive and persistent nature of his delusions, including his belief he is being persecuted by Federal Judges, his charges have already been dismissed, and the Supreme Court has pardoned him, and his repeated refusal to take anti-psychotic medication; there is no reason to believe Mr. Harker will become competent to proceed to trial.

(Government's Ex. 1 at 8-9)

7. Dr. Berger testified that medication has been discussed with defendant Harker and offered to him with the rationale explained, but Harker has declined to consider medication, feeling he has no mental illness and no need for medication. (Tr. at 6-7) Dr. Berger opined that Harker would most likely disagree to take medication even if an order was entered by the court as he would think the order was incorrect and the medication unnecessary. (Tr. at 26)

6

8. With respect to whether there is a reason to involuntarily medicate defendant Harker, other than for the purpose of rendering him competent to stand trial, the doctors at the Federal Medical Center in Butner opined:

> It is our opinion Mr. Harker does not meet the criteria for an Involuntary Medication Hearing pursuant to the guidelines of the Supreme Court decision and opinion set forth in Washington v. Harper, 494 U.S. 210 (1990). Mr. Harker is not gravely disabled, is not considered an imminent risk for danger to self or others, and has been safely managed on an open mental health unit.

(Government's Ex. 1 at 9)

9. The Forensic Evaluation report provided the following with respect to the issue of whether defendant Harker should be involuntarily medicated for the purpose of rendering him competent to stand trial:

> ... [W]e are requesting a judicial order granting permission to medicate him with psychotropic medications for the purpose of rendering him competent to proceed to trial pursuant to the Supreme Court decision in Sell v. United States, 539 U.S. 166 (2003).
>
> The first prong of the Sell decision, whether important governmental interests are at stake in bringing to trial an individual accused of a serious crime, is strictly within the domain of the Court and will not be addressed here.
>
> The second prong of the Sell decision addresses whether treatment with an antipsychotic medication is substantially likely to render the defendant competent to stand trial. It is clear Mr. Harker suffers from significant psychotic symptoms that have not remitted spontaneously or with non-medical interventions. Psychotic disorders, such as Delusional Disorder and Schizophrenia, typically have chronic courses and are unlikely to improve without treatment. Administration of antipsychotic medications is the appropriate and accepted treatment of psychotic disorders. There are available data to suggest a large percentage of incompetent defendants suffering from schizophrenia and related psychotic disorders who refuse the recommended treatment with antipsychotic medication can be restored to competency to stand trial following a period of involuntary treatment. There are two studies published in 1993 by Ladds and colleagues that describe a group of 61 incompetent pretrial defendants in the state of New York who were referred for judicial review for involuntary treatment with psychotropic medication. Forty five of these defendants were involuntarily medicated, with 87% initially being rendered competent to stand trial. The majority of these defendants subsequently resolved their cases by plea negotiation, including five cases of insanity acquittal. Six individuals went to trial, resulting in five convictions and one insanity acquittal. One of the conclusions of this study was that there is no evidence that forced medication per se during a pretrial hospitalization worsens the outcome of pending criminal charges. The positive response to treatment is consistent with the published data on the effectiveness of antipsychotic medication in treating psychotic disorders in clinical settings. There is no evidence Mr. Harker has ever complied with antipsychotic treatment. Records indicate he took only one dose of the antipsychotic medication olanzapine recommended by his

7

treatment team during a previous hospitalization. Consistent treatment with antipsychotic medication, which would currently require involuntary administration, will likely reduce the intensity of Mr. Harker's psychotic symptoms, such that he could be restored to competency to stand trial.

The third prong of the <u>Sell</u> decision is that the Court must conclude that involuntary medication is necessary to further those interests and find that alternative, less intrusive treatments are unlikely to achieve substantially the same results. Mr. Harker does not have insight into or understanding of his mental illness; hence he sees no need for treatment. He has remained delusional for an extended period of time while not treated with antipsychotic medication. Due to his delusional beliefs, he is currently unable to engage in any form of psychotherapy. He was repeatedly asked to leave the competency restoration group, as he insisted on discussing his delusional ideations. There is no compelling evidence that psychotic disorders respond as well or better to treatment with nonpharmalogical interventions alone compared to the response to treatment with antipsychotic medications. As such, we opine that involuntary medication is necessary because alternative, less intrusive treatments are unavailable at this time and are unlikely to achieve substantially the same result of restoring his competency.

The fourth prong of the <u>Sell</u> decision is that the Court must find that administration of the drugs is medically appropriate. The administration of antipsychotic medication is a standard component of treatment for anyone suffering a psychotic disorder as significant as Mr. Harker's. Antipsychotic medications can produce beneficial clinical effects such as reducing delusional thoughts and beliefs, which are prominent in this case, as well as decreasing auditory hallucinations, which have been present historically. The effectiveness of antipsychotic medication in treating psychotic disorders has been repeatedly demonstrated in published professional literature, and is considered an essential element in the treatment of these conditions.

Mr. Harker refused psychotropic medications since admission, so there is not currently an individualized treatment plan in place for him. If the Court grants our request for involuntary medication, attempts will be made to engage Mr. Harker in his treatment. If he is agreeable to taking oral medications, he will be offered any available antipsychotic medication. If he does not have a preference, he will be offered olanzapine or risperidone. Both of these are 2nd generation (or atypical) antipsychotics available in orally disintegrating tablets, which allow for improved compliance. If oral medication is used, Mr. Harker must agree to measures to check his compliance, such as mouth checks and blood drug level monitoring. Mr. Harker is not currently taking any medications, so there is no risk of drug-drug interaction with initiating an antipsychotic regimen.

* * *

It is not practical to administer short-acting injectable medication on a daily basis; thus, if Mr. Harker is not agreeable to oral medication initially, we will rely on a long acting injectable antipsychotic. These include Prolixin Decanoate, Haldol Decanoate, and Risperdal Consta. Prior to the administration of any of these long-acting medications, a test dose of the

8

       short acting formulation is required for safety purposes to rule out unexpected allergic injections. As Risperdal does not have an available short-acting injectable, our choice is limited to either Prolixin Decanoate or Haldol Decanoate. Both of these medications are conventional or 1st generation antipsychotic medications, and as such have similar side effect profiles. Prolixin Decanoate is given every 2 weeks, and once steady state is reached, Haldol Decanoate is given every 4 weeks. If at anytime after the initiation of intramuscular Prolixin or Haldol, Mr. Harker voluntarily agreed to take an oral antipsychotic, he would be transitioned to one of the above mentioned atypical antipsychotics. If he preferred a long-acting formulation, Risperdal Consta could be prescribed following a test of tolerability using oral Risperdal.

    (Government's Ex. 1 at 9-12)

10. Dr. Berger testified that the involuntary administration of antipsychotic medication is the primary and required treatment in order to begin to diminish defendant Harker's psychotic symptoms. (Tr. at 7) According to Dr. Berger, antipsychotic medications have been used since the 1950s for the treatment of psychotic disorders. (Tr. at 7) Dr. Berger testified that the statistics that appear to be most reasonable show that approximately 70 percent of people treated with antipsychotic therapy have substantial or total remission of their symptoms and hence a decrease in their irrational beliefs and increased contact with reality. (Tr. at 7) Dr. Berger stated that once defendant Harker's psychotic symptoms are diminished with the use of medication, other therapies such as talking therapies could be useful. (Tr. at 7) However, any other type of therapy such as counseling or something less intrusive than the involuntary use of medication would be ineffective without the primary treatment of antipsychotic therapy. (Tr. at 8)

11. With respect to potential side effects from the administration of antipsychotics, the Forensic Evaluation report provides:

       The most notable side effects associated with atypical antipsychotics are their negative effect on metabolic processes. These medications can cause an increase in appetite, which can be associated with weight gain, hyperglycemia (elevated blood sugar), and hyperlipidemia (elevated lipid panel). Weight is monitored in our facility by an initial measurement of body mass index with follow-up every three months. If Mr. Harker experiences excessive weight gain, i.e. greater than 10 pounds; we would recommend lifestyle changes such as diet and exercise. If these measures fail, we would consider an alternative atypical antipsychotic, such as Geodon or Abilify, which have more favorable metabolic profiles. Hyperglycemia occurs in a minority of patients, is reversible with discontinuation and rarely results in diabetes or life threatening hyperglycemia. Mr. Harker's fasting blood sugars would be monitored at onset of treatment and every three months along with clinical monitoring. Hyperlipidemia, defined as an elevation of triglycerides and low density lipoprotein (LDL) with a lowering of high density lipoprotein (HDL) is a possible adverse effect of atypical antipsychotics. This is monitored by an initial lipid profile with repeated levels checked every three months initially, and extended to every six months with chronic treatment. If Mr. Harker were to develop hyperlipidemia, options for management consist of switching to atypical antipsychotics with

9

a more favorable effect on lipid profile, such as Geodon or Abilify, lifestyle changes mentioned above, and/or referral to medical services for treatment with lipid lowering medications.

* * *

The most notable side effects of typical antipsychotics, i.e. Haldol and Prolixin, are involuntary movement disorders including Parkinsonian effects, dystonic reactions, akathisia, and tardive dyskinesia. With the exception of tardive dyskinesia, these side effects are reversible with discontinuation of the medication. Parkinsonian effects are most common, and include muscle stiffness, cogwheel rigidity, shuffling gait, stooped posture, and a coarse tremor. These symptoms are lessened by the administration of Cogentin, an anticholinergic medication. This medication can be dosed on a standing or as needed basis, depending on the severity and frequency of the symptoms. Dystonic reactions consist of slow, sustained muscular contractions or spasm involving the neck, jaw, tongue, or entire body. Dystonic reactions can be avoided by giving a dose of intramuscular Cogentin during the first two doses of an injectable antipsychotic. If Mr. Harker experienced a dystonic reaction, he would be prescribed a twice daily dose of Cogentin for the first 2 weeks of treatment, which could be extended if clinically warranted. Akathisia is the subjective feeling of muscular discomfort, inner restlessness, and a compelling need to be in constant motion. The addition of propranolol (a beta blocker) or lorazepam (a benzodiazepine) would be considered in treating this side effect. Should Mr. Harker develop one of the above mentioned movement disorders, lowering his dose of typical antipsychotic medication would also be considered.

The side effect of tardive dyskinesia is most serious due to possible irreversibility and incapacitation. This side effect is associated with long-term use of typical antipsychotics, and is rarely seen in the first four to six months of treatment. This syndrome consists of involuntary, irregular combinations or writhing and jerking movements of the voluntary muscles of the head, limbs, and or face/trunk, but most commonly occurs in the oral/facial region. The severity of this condition can range from minimal to grossly incapacitating. The approach to tardive dyskinesia is prevention, diagnosis, and management. Following the initiation of treatment, tardive dyskinesia is monitored at each clinical contact and documented monthly with the use of the Abnormal Involuntary Movement Scale (AIMS). Unfortunately, there is no effective treatment for tardive dyskinesia. Early intervention is imperative, with discontinuation of the antipsychotic resulting in the reversal of tardive dyskinesia in 50% of cases. The only established treatment for intractable tardive dyskinesia is discontinuation of the offending antipsychotic and switching to the atypical antipsychotic clozapine.

The risk for the development of neuroleptic malignant syndrom, a potentially life threatening event, is theoretically present with the use of any antipsychotic medications, but it is rare (i.e. 0.07% [to] 2%). The symptoms may include muscular rigidity, dystonia, high fever, labile blood pressure, increased heart rate, and altered mental status.

10

> While there are potential adverse effects to the medications used to treat psychotic disorders, there are also significant risks associated with not treating these illnesses. Results of clinical studies suggest that the duration of untreated psychosis is associated with relatively poor clinical and social outcomes (e.g. homelessness, incarceration, and victimization).

(Government's Ex. 1 at 12-13)

12. Dr. Berger testified that because defendant Harker has had no experience with antipsychotic medications, the doctors must go on their general knowledge of the benefits of the medicines versus the potential side effects of the medicines, based on groups of people. (Tr. at 13) Dr. Berger testified that if approved, he starts the medication very slowly. (Tr. at 16) If side effects are experienced, Dr. Berger discusses with the patient the different options to medically treat the side effects. (Tr. at 16)

13. Dr. Berger testified that while drowsiness can be a side effect of antipsychotic medications, it usually occurs early on in the treatment as the person is getting used to it. (Tr. at 14) The doctors do not see sedation to the degree that it would pose a problem for a defendant in assisting with his defense. (Tr. at 14) Likewise, while agitation or behavior problems can sometimes be a side effect of antipsychotic medications, typically, antipsychotic medications improve behavioral symptoms. (Tr. at 12)

14. Dr. Berger testified that if defendant Harker were involuntarily medicated, there would be an ongoing evaluation asking Harker both his subjective reactions to the medicine as well as the medical staff's objective observations. (Tr. at 20) When asked if there was a plan in place in order to monitor and treat side effects, Dr. Berger testified:

> Typically, the plan is to do observation by clinical contact and actually asking Mr. Harker through either nursing or medical staff, what symptoms he's experiencing, alert him to what symptoms he can expect just like you do with anything even, and then physically examine him, for example, just a brief neurological exam for the neuromuscular symptoms. The metabolic symptoms we would get based on laboratory values and we would monitor that on a regular basis. Particularly things such as his lipid levels, his cholesterol level and his glucose level. We also just monitor his general weight and advise him on the fact that he needs to watch his weight. So, those would be the things that we would do. In fact, if the order would be granted, we would ask to have included in the order permission to do the basic metabolic tests that would help ensure his safety and monitor his side effects.

(Tr. at 20-21) If defendant Harker were in distress and side effect medication was not efficacious, Dr. Berger testified the doctors would switch medicines. (Tr. at 20) In some cases, the doctors have had to just stop the medicine after several medication trials because there is that percentage of people who do not react positively to the medicine. (Tr. at 20) However, in the majority of cases, there is successful improvement. (Tr. at 20)

15. The Forensic Evaluation report contained the following conclusion:

11

> In summary, we offer the opinion that Mr. Harker is not currently competent to proceed to trial. We further opine that there is a substantial probability his competence status can be restored with a period of treatment with antipsychotic medication. Therefore, we recommend the Court consider our request for involuntary administration of antipsychotic medication under Sell v. United States in order to restore Mr. Harker's competency to stand trial.

(Government's Ex. 1 at 13) Dr. Berger testified that it is his opinion that involuntary medication is necessary in order to render defendant Harker competent to stand trial. (Tr. at 8) According to Dr. Berger, all of the antipsychotic medications have essentially the same probability of improving a person's psychosis. (Tr. at 8) The medications differ primarily on potential side effects profiles. (Tr. at 8) Dr. Berger has taken into account the potential side effects in his decision that antipsychotic medication should be administered to defendant Harker. (Tr. at 19)

### III.  DISCUSSION

In Sell v. United States, 539 U.S. 166 (2003), the Supreme Court found that before a court analyzes whether a defendant may be involuntarily medicated for the purpose of rendering him competent to stand trial, the court should examine whether involuntary medication can be justified on an alternative ground:

> A court need not consider whether to allow forced medication for [the purpose of rendering a defendant competent to stand trial], if forced medication is warranted for a *different* purpose, such as the purposes set out in [Washington v. Harper, 494 U.S. 210 (1990)] related to the individual's dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his health gravely at risk. 494 U.S. at 225-26. There are often strong reasons for a court to determine whether forced administration of drugs can be justified on these alternative grounds *before* turning to the trial competence question.

Id. at 181-82. If an alternative grounds is not available, the Court set forth strict criteria that must be met before a court can approve the involuntary medication of a defendant for the purpose of rendering him competent to stand trial. The Court stated:

> the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.

Id. at 179. The Court expanded on the four factors to be addressed in determining whether a defendant may be involuntarily medicated solely for trial competence purposes:

12

> First, a court must find that *important* governmental interests are at stake. The Government's interest in bringing to trial an individual accused of a serious crime is important. ...
>
> Second, the court must conclude that involuntary medication will *significantly further* those concomitant state interests. It must find that administration of the drugs is substantially likely to render the defendant competent to stand trial. At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair. ...
>
> Third, the court must conclude that involuntary medication is *necessary* to further those interests. The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results. ... And the court must consider less intrusive means for administering the drugs, e.g., a court order to the defendant backed by the contempt power, before considering more intrusive methods.
>
> Fourth, ... the court must conclude that administration of the drugs is *medically appropriate*, i.e., in the patient's best medical interest in light of his medical condition. The specific kinds of drugs at issue may matter here as elsewhere. Different kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success.

Sell, 539 U.S. at 180-81 (emphasis in original).

In the case currently before the Court, alternative grounds for involuntary medication do not appear to be present. As the Forensic Evaluation report provides, defendant Harker is not gravely disabled, is not considered an imminent risk for danger to self or others, and has been safely managed on an open mental health unit. (See Fact No. 8, supra) Thus, the Court will examine whether defendant may be involuntarily medicated for the purpose of rendering him competent to stand trial. As set forth below, the Court finds that the Government has met its burden on each of the four Sell factors.

1. Important Governmental Interests Are At Stake

At the Sell hearing, government counsel stated the following to show that important governmental interests are at stake in bringing defendant to trial:

> We would stand on the two indictments that are currently before the District Court to show that the Government does have an important interest in bringing Mr. Harker to trial in a timely manner. We feel that both indictments are important and significant, particularly in regard to threatening federal judges.

(Tr. at 33-34)

As set forth in United States v. Evans, 404 F.3d 227, 237 (4th Cir. 2005), "it is appropriate to focus on the maximum penalty authorized by statute in determining if a crime is 'serious' for involuntary medication purposes." The Evans court concluded that a charge carrying a maximum term of imprisonment of ten years should be considered "serious" under any reasonable standard. 404 F.3d at 238.

In Case No. 08-00124-01-CR-W-NKL, the maximum penalty authorized is twenty years imprisonment on Count One and five years imprisonment on Count Two. (See Indictment, doc #1) In Case No. 08-00162-01-CR-W-NKL, the maximum penalty authorized is ten years imprisonment. (See Indictment, doc #23)

Even if the Court concludes that defendant Harker is facing a serious charge, the Supreme Court noted in Sell that the government's important interest in prosecuting the defendant on serious charges can be lessened under special circumstances.[1] See Sell v. United States, 539 U.S. 166, 180 (2003). The Court notes that defendant has been in federal custody since May 1, 2008. However, even if credited for the time already served, defendant Harker is still facing over eighteen years in prison on one of the felony charges against him. Under any reasonable standard, the government has an important interest in trying a defendant who is charged with a crime that has the potential of an eighteen-year prison term. See United States v. Evans, 404 F.3d 227, 239 (4th Cir. 2005). Defendant Harker's past detention does not render unimportant the government's interest in prosecuting him.

---

[1] The Sell court offered two examples of special circumstances that may lessen the importance of the government's interest in prosecution:

> The defendant's failure to take drugs voluntarily, for example, may mean lengthy confinement in an institution for the mentally ill-and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime. ... The same is true of the possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed ...).

Sell v. United States, 539 U.S. 166, 180 (2003).

14

Likewise, the possibility of civil commitment does not render unimportant the government's interest in prosecuting defendant Harker. The federal civil commitment statute requires a showing that the patient presents "a substantial risk of bodily injury to another person or serious damage to property of another." 18 U.S.C. § 4246(a). While the Forensic Evaluation report states that "Mr. Harker ... is not considered an imminent risk for danger to self or others, and has been safely managed on an open mental health unit" (see Fact No. 8, supra), defendant Harker has not been evaluated for purposes of 18 U.S.C. § 4246. The record does not presently support an argument that defendant Harker would be a candidate for civil commitment, thus rendering unimportant the government's interest in prosecuting him.

The Court can identify no other special circumstances tending to diminish the importance of the government's interest in restoring defendant Harker to competence so that he may face trial. Therefore, the Court finds that important governmental interests are at stake in restoring defendant Harker to competency.

### 2. Medication Is Substantially Likely To Render Defendant Competent

The Forensic Evaluation report set forth the following treatment plan that would be administered if directed by the Court to involuntarily medicate defendant Harker:

> Mr. Harker refused psychotropic medications since admission, so there is not currently an individualized treatment plan in place for him. If the Court grants our request for involuntary medication, attempts will be made to engage Mr. Harker in his treatment. If he is agreeable to taking oral medications, he will be offered any available antipsychotic medication. If he does not have a preference, he will be offered olanzapine or risperidone. Both of these are 2nd generation (or atypical) antipsychotics available in orally disintegrating tablets, which allow for improved compliance. If oral medication is used, Mr. Harker must agree to measures to check his compliance, such as mouth checks and blood drug level monitoring. Mr. Harker is not currently taking any medications, so there is no risk of drug-drug interaction with initiating an antipsychotic regimen.
>
> * * *
>
> It is not practical to administer short-acting injectable medication on a daily basis; thus, if Mr. Harker is not agreeable to oral medication initially, we will rely on a long acting injectable antipsychotic. These include Prolixin Decanoate, Haldol Decanoate, and Risperdal Consta. Prior to the administration of any of these long-acting medications, a test dose of the short acting formulation is required for safety purposes to rule out unexpected allergic injections. As Risperdal does not have an

15

available short-acting injectable, our choice is limited to either Prolixin Decanoate or Haldol Decanoate. Both of these medications are conventional or 1st generation antipsychotic medications, and as such have similar side effect profiles. Prolixin Decanoate is given every 2 weeks, and once steady state is reached, Haldol Decanoate is given every 4 weeks. If at anytime after the initiation of intramuscular Prolixin or Haldol, Mr. Harker voluntarily agreed to take an oral antipsychotic, he would be transitioned to one of the above mentioned atypical antipsychotics. If he preferred a long-acting formulation, Risperdal Consta could be prescribed following a test of tolerability using oral Risperdal.

(See Fact No. 9, supra)

As set forth above, in order to satisfy the second Sell factor, the Court must find:

> that administration of the drugs is substantially likely to render the defendant competent to stand trial. At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair.

Sell v. United States, 539 U.S. 166, 181 (2003).

The Forensic Evaluation report provided the following in support of a finding that the administration of a drug treatment plan is substantially likely to render defendant Harker competent to stand trial and substantially unlikely to have side effects that will interfere significantly with his ability to assist counsel in conducting a trial defense:

> The second prong of the Sell decision addresses whether treatment with an antipsychotic medication is substantially likely to render the defendant competent to stand trial. It is clear Mr. Harker suffers from significant psychotic symptoms that have not remitted spontaneously or with non-medical interventions. Psychotic disorders, such as Delusional Disorder and Schizophrenia, typically have chronic courses and are unlikely to improve without treatment. Administration of antipsychotic medications is the appropriate and accepted treatment of psychotic disorders. There are available data to suggest a large percentage of incompetent defendants suffering from schizophrenia and related psychotic disorders who refuse the recommended treatment with antipsychotic medication can be restored to competency to stand trial following a period of involuntary treatment. There are two studies published in 1993 by Ladds and colleagues that describe a group of 61 incompetent pretrial defendants in the state of New York who were referred for judicial review for involuntary treatment with psychotropic medication. Forty five of these defendants were involuntarily medicated, with 87% initially being rendered competent to stand trial. The majority of these defendants subsequently resolved their cases by plea negotiation, including five cases of insanity acquittal. Six individuals went to trial, resulting in five convictions and one insanity acquittal. One of the conclusions of this study was that there is no evidence that forced medication per se during a pretrial hospitalization worsens the outcome of pending criminal charges. The positive response to treatment is consistent with the published data on the effectiveness of antipsychotic medication in treating psychotic disorders in

16

clinical settings. There is no evidence Mr. Harker has ever complied with antipsychotic treatment. Records indicate he took only one dose of the antipsychotic medication olanzapine recommended by his treatment team during a previous hospitalization. Consistent treatment with antipsychotic medication, which would currently require involuntary administration, will likely reduce the intensity of Mr. Harker's psychotic symptoms, such that he could be restored to competency to stand trial.

(See Fact No. 9, supra)

Dr. Berger testified that while drowsiness can be a side effect of antipsychotic medications, it usually occurs early on in the treatment as the person is getting used to it and the doctors do not see sedation to the degree that it would pose a problem for a defendant in assisting with his defense. (See Fact No. 13, supra) Likewise, while agitation or behavior problems can sometimes be a side effect of antipsychotic medications, typically, antipsychotic medications improve behavioral symptoms. (Id.)

Based on a review of the Forensic Evaluation report and Dr. Berger's testimony at the Sell hearing, the Court finds that the medication proposed is substantially likely to render defendant Harker competent to stand trial and substantially unlikely to have side effects that will interfere significantly with defendant's ability to assist counsel in conducting a trial defense.

### 3. Involuntary Medication Is Necessary To Render Defendant Competent

In order to satisfy the third Sell factor, the Court must find:

> that involuntary medication is *necessary* to further [the Government's interest in bringing defendant to trial]. The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results. ... And the court must consider less intrusive means for administering the drugs, e.g., a court order to the defendant backed by the contempt power, before considering more intrusive methods.

Sell v. United States, 539 U.S. 166, 181 (2003).

The Forensic Evaluation report provided the following in support of a finding that involuntary medication of defendant Harker is necessary to restore his competence and that there are no alternative, less intrusive treatments that are likely to achieve the same results:

> The third prong of the Sell decision is that the Court must conclude that involuntary medication is necessary to further those interests and find that alternative, less intrusive treatments are unlikely to achieve substantially the same results. Mr.

17

> Harker does not have insight into or understanding of his mental illness; hence he sees no need for treatment. He has remained delusional for an extended period of time while not treated with antipsychotic medication. Due to his delusional beliefs, he is currently unable to engage in any form of psychotherapy. He was repeatedly asked to leave the competency restoration group, as he insisted on discussing his delusional ideations. There is no compelling evidence that psychotic disorders respond as well or better to treatment with nonpharmalogical interventions alone compared to the response to treatment with antipsychotic medications. As such, we opine that involuntary medication is necessary because alternative, less intrusive treatments are unavailable at this time and are unlikely to achieve substantially the same result of restoring his competency.

(See Fact No. 9, supra)

Dr. Berger also addressed this issue and testified that any other type of therapy such as counseling or something less intrusive than the involuntary use of medication would be ineffective without the primary treatment of antipsychotic therapy. (See Fact No. 10, supra)

The Sell court directed that courts consider less intrusive means for administering the drugs such as a court order to the defendant backed by the contempt power. The Court has considered this option, but given the professional opinion of Dr. Berger that defendant Harker would most likely disagree to take medication even if an order was entered by the court as he would think the order was incorrect and the medication unnecessary (see Fact No. 7, supra), it appears that such an approach would only act to further delay this case.

From a review of all the materials submitted in this case, the Court finds that antipsychotic medication is necessary to restore defendant Harker competency. There do not appear to be any treatments that would be less intrusive than the involuntary administration of antipsychotic medication that are likely to achieve substantially the same results as treatment with antipsychotic medication.

### 4. The Proposed Medication Is Medically Appropriate

In order to satisfy the fourth Sell factor, "the Court must conclude that administration of the drugs is *medically appropriate*, i.e., in the patient's best medical interest in light of his medical condition." Sell v. United States, 539 U.S. 166, 181 (2003).

The Forensic Evaluation report provided the following in support of a finding that

Case 4:08-cr-00124-GAF   Document 26   Filed 11/25/09   Page 18 of 20

involuntary medication of defendant Harker is in his best medical interest:

> The fourth prong of the Sell decision is that the Court must find that administration of the drugs is medically appropriate. The administration of antipsychotic medication is a standard component of treatment for anyone suffering a psychotic disorder as significant as Mr. Harker's. Antipsychotic medications can produce beneficial clinical effects such as reducing delusional thoughts and beliefs, which are prominent in this case, as well as decreasing auditory hallucinations, which have been present historically. The effectiveness of antipsychotic medication in treating psychotic disorders has been repeatedly demonstrated in published professional literature, and is considered an essential element in the treatment of these conditions.

(See Fact No. 9, supra)

Dr. Berger testified that the involuntary administration of antipsychotic medication is the primary and required treatment in order to begin to diminish defendant Harker's psychotic symptoms. (See Fact No. 10, supra) According to Dr. Berger, antipsychotic medications have been used since the 1950s for the treatment of psychotic disorders. (Id.) Dr. Berger testified that the statistics that appear to be most reasonable show that approximately 70 percent of people treated with antipsychotic therapy have substantial or total remission of their symptoms and hence a decrease in their irrational beliefs and increased contact with reality. (Id.) Dr. Berger further testified that because defendant Harker has had no experience with antipsychotic medications, the doctors must go on their general knowledge of the benefits of the medicines versus the potential side effects of the medicines, based on groups of people. (See Fact No. 12, supra)

As set out above, the Forensic Evaluation report provides the Court with a detailed treatment plan for defendant Harker. The fact that the plan may be modified if defendant Harker is unable to tolerate the medication or if the side effects are significant, does not, in this Court's opinion, detract from the appropriateness of the plan. Rather, it makes the plan more practical and useful. The Court is not an expert in the field of psychiatry. It must rely on the expertise of the medical staff. If the Court were to require that the doctors provide a treatment plan set in stone and then require that the doctors obtain the Court's permission before making any changes that the doctors determined were necessary, there would be resulting delays that might adversely affect defendant Harker.

As stated by the court in United States v. Bethea, 2006 WL 1313977, \*6 (E.D. Mo. May 11,

2006), "[a]lthough there is some risk of serious side effects, the risk is slight and can be minimized through the type of careful monitoring available at the Medical Center." From a review of the materials submitted in this case, including the benefits and risks associated with various antipsychotic medications, the Court finds that the treatment plan proposed in the Forensic Evaluation report is medically appropriate.

## IV. CONCLUSION

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order returning defendant Harker to the Federal Medical Center in Butner, North Carolina, and directing the Federal Medical Center to commence the involuntary medication of defendant Harker in order to render him competent to stand trial. As part of this order, the Federal Medical Center should be granted permission to do the basic metabolic tests that would help ensure defendant Harker's safety and monitor any side effects from the medication.

Counsel are reminded they have ten days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

    /s/ Sarah W. Hays    
SARAH W. HAYS
UNITED STATES MAGISTRATE JUDGE